Citation Nr: 1554520 
Decision Date: 12/31/15 Archive Date: 01/07/16

DOCKET NO. 13-28 633 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to service connection for Type II diabetes mellitus (DM II), as a result of exposure to herbicides.

2. Entitlement to service connection for prostate cancer, as a result of exposure to herbicides.

3. Entitlement to an initial evaluation in excess of 30 percent for posttraumatic stress disorder (PTSD).

4. Entitlement to service connection for the Veteran's cause of death.



REPRESENTATION

Appellant represented by: Joseph R. Moore, Attorney at law


ATTORNEY FOR THE BOARD

J. L. Burroughs, Associate Counsel

INTRODUCTION

The Veteran served on active duty in the U.S. Air Force from December 1966 to December 1970. The appellant is his widow.

The statute concerning accrued benefits claims was amended on October 10, 2008. Veterans' Benefits Improvement Act of 2008, Pub. L. No. 110-389, § 212 (2008). Section 212 created a new statute, which provides that if a claimant died while a claim or appeal for any benefit under a law administered by VA was pending, a living person who would be eligible to receive accrued benefits due to the claimant may, not later than one year after the date of the death of the claimant, request to be substituted as the claimant for the purposes of processing the claim to completion. See 38 U.S.C.A. § 5121A. 

The provisions of the new statute apply with respect to the claim of any claimant who dies on or after October 10, 2008. See Pub. L. No. 110-389, § 212, 122 Stat. 4145, 4151 (2008). In the instant case, the Veteran died in February 2014.

In May 2014, the appellant filed a request for substitution upon the death of the claimant. In August 2014, the RO recognized the appellant, the Veteran's surviving spouse, as a properly appointed substitute claimant. At the time of the Veteran's death, his pending claims were as listed on the title page with the exception of the claim of service connection for the cause of the Veteran's death.

This matter comes before the Board of Veteran's Appeals (Board) on appeal from an October 2010 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida. In the October 2010 rating decision, the RO granted service connection for PTSD, assigned a 30 percent evaluation effective from the date of claim, and denied service connection for DM II and prostate cancer.

In September 2015, this matter was remanded by the Board to afford the appellant a Travel Board Hearing that was previously requested by the Veteran. Shortly thereafter, she requested that the hearing be waived and the claims be decided based solely on the evidence of record. See Statement from Representative dated in September 2015. Accordingly, the Board will proceed to evaluate the appeal.

The issue of entitlement to service connection for the Veteran's cause of death is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. The Veteran served at the Royal Thai Air Force Base (RTAFB) in Udorn, Thailand, in the late 1960s, during his period of active service.
 
2. The Veteran has presented a credible account of having duty postings at, or near, the perimeter of the Udorn RTAFB during active military service.
 
3. The Veteran was exposed to chemical herbicides containing dioxin (Agent Orange) during active service and his diagnosed Type II diabetes mellitus is presumed to have been caused by that exposure.

4. The Veteran was exposed to chemical herbicides containing Agent Orange during active service and his diagnosed prostate cancer is presumed to have been caused by that exposure.

5. For the period of the appeal, the evidence fails to demonstrate that the Veteran's PTSD resulted in occupational and social impairment with reduced reliability and productivity and difficulty in establishing and maintaining effective work and social relationships.


CONCLUSIONS OF LAW

1. The criteria for service connection for Type II diabetes mellitus have been met. 38 U.S.C.A. §§ 1110, 5107(b) (West 2014); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2015).

2. The criteria for service connection for prostate cancer have been met. 38 U.S.C.A. §§ 1110, 5107(b) (West 2014); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2015).

3. The criteria for an initial rating in excess of 30 percent for PTSD are not met. 38 U.S.C.A. § § 1155, 5107 (West 2014); 38 C.F.R. § § 3.159, 4.7, 4.130, Diagnostic Code 9411 (2015).


 (CONTINUED ON NEXT PAGE)


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Assist and Notify

As to the Veteran's claim for service connection for DM II and prostate cancer, these claims have been granted, as discussed below. As the benefits sought are granted in full, even if there was a defect in VA meeting its duties to notify and assist the Veteran in obtaining evidence to substantiate his claims or a defect in compliance with a remand directive, the defect is not prejudicial to the Veteran so no further discussion of VA's duties or remand compliance is necessary. See 38 U.S.C.A. §§ 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2015); Mayfield v. Nicholson, 19 Vet. App. 103, (2005), rev'd on other grounds, Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006).

Regarding the PTSD claim, VA has a duty to notify and assist claimants in substantiating claims for VA benefits. See e.g. 38 U.S.C.A. §§ 5103, 5103A (West 2014) and 38 C.F.R. § 3.159 (2015). VA provided adequate notice in a letter sent to the Veteran in March 2010. 

The Veteran's claim for a higher evaluation is a downstream issue, which was initiated by the notice of disagreement. The Court has held that, as in this case, once a notice of disagreement from a decision establishing service connection and assigning the rating and effective date has been filed, the notice requirements of 38 U.S.C.A. §§ 5104 and 7105 control as to the further communications with the appellant, including as to what "evidence [is] necessary to establish a more favorable decision with respect to downstream elements..." Goodwin v. Peake, 22 Vet. App. 128, 137 (2008). There is no duty to provide additional notice in this case.

As to VA's duty to assist, all appropriate development to obtain the Veteran's pertinent medical records, to include service treatment records, available post-service treatment records and lay statements, has been completed. Additionally, after repeated requests for documents, in June 2010 the Social Security Administration confirmed there were no medical records regarding the Veteran in its possession. Lastly, the appellant has not identified any pertinent, outstanding records that could be obtained to substantiate the claim. The Board is also unaware of any such records. 

The Veteran was afforded an adequate VA examination in September 2010. The examiner reviewed the relevant medical history and provided opinion with supporting rationale and citation to the evidence. 

Finally, as discussed above, the appellant waived her right to a Board hearing. As that was the only directive of the September 2015 remand, the Board is therefore satisfied that there has been substantial compliance. Stegall v. West, 11 Vet. App. 268, 271 (1998); D'Aries v. Peake, 22 Vet. App. 97, 105 (2008) (finding that only substantial compliance, rather than strict compliance, with the terms of a Board engagement letter requesting a medical opinion is required). 

VA's duties to notify and assist have been met, and appellate review may proceed without prejudice to the Veteran. See Bernard v. Brown, 4 Vet. App. 384 (1993).

Service Connection Laws and Regulations

Service connection may be established for a disability resulting from personal injury suffered or disease contracted in the line of duty in the active military, naval, or air service. 38 U.S.C.A. § 1110 (West 2014). However, that an injury or disease occurred in service is not enough; there must also be a chronic disability resulting from that injury or disease. If there is no showing of the chronic disability during service, then a showing of continuous symptoms after service is required to support a finding of chronicity. 38 C.F.R. § 3.303(b) (2015). Service connection may also be granted for any injury or disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease or injury was incurred in service. 38 C.F.R. § 3.303(d) (2015).

In order to establish service connection for a disability, there must be (1) medical evidence of a current disability; (2) medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the claimed in-service disease or injury and the current disability. See Hickson v. West, 12 Vet. App. 247, 253 (1999).

Additionally, if a veteran was exposed to an herbicide agent during active military, naval, or air service, certain diseases, including prostate cancer and DM II, shall be service connected if it becomes manifest to a degree of 10 percent disabling or more at any time after service. 38 C.F.R. § 3.307(a)(6) (2015). This presumption of service connection will attach, even in the absence of any evidence of the disease while in service, provided that the rebuttable presumption provisions of 38 U.S.C.A. § 1113 and 38 C.F.R. § 3.307(d) are also satisfied. 38 C.F.R. § 3.309(e) (2015).

Type II Diabetes Mellitus and Prostate Cancer

The Veteran asserted that his DM II and prostate cancer were caused by his service at the RTAFB, at Udorn. See September 2013 Statement. Essentially, he contended that during Air Force service he was exposed to chemical herbicides that were applied to control the vegetation growing around the perimeter of the RTAFB, at Udorn. Id. As a result of that exposure, he developed DM II and prostate cancer. 

Personnel records substantiate that he was stationed in Thailand, at the Udorn RTAFB, from April 1968 to May 1969. 

In this regard, there have been important changes in the protocols involved with VA's development of claims based on alleged exposure to dioxin-based herbicides in Thailand. A May 2010 VA Compensation and Pension Bulletin indicated that, after reviewing documents related to herbicide use in Vietnam and Thailand, it had been determined that there was significant use of herbicides on the fenced-in perimeters of military bases in Thailand, which was intended to eliminate vegetation and ground cover for base security purposes. 

The evidence of this was found in a declassified Vietnam War era Department of Defense (DoD) document titled Project CHECO Southeast Asia Report: Base Defense in Thailand. The report observes that some evidence indicates that the herbicides used on the Thailand base perimeters may have been either tactical, procured from the Republic of Vietnam, or a commercial variant of much greater strength and with the characteristics of tactical herbicides. 

Thus, according to the VA Compensation and Pension Service, when herbicide-related claims involving Thailand service are received, VA personnel should now evaluate the treatment and personnel records to determine whether a veteran's service activities involved duty on or near the perimeter of the military base where the veteran was stationed. It was ultimately determined that special consideration of herbicide exposure cases should be extended to those veterans whose duties placed them on or near the perimeters of Thailand military bases. This allows for presumptive service connection of the diseases associated with herbicide exposure.

Accordingly, the VA's Adjudication Procedure Manual Rewrite, M21-1MR, Part IV, Subpart ii, Chapter 2, Section C, para. 10(q) was adopted for application when a veteran alleged exposure to herbicides in Thailand. It directs, in pertinent part, that if a veteran served in the United States Air Force during the Vietnam Era at one of the specified Royal Thai Air Force Bases (RTAFBs), including at Udorn, as an Air Force security policeman, a security patrol dog handler, a member of the security police squadron, or in a capacity that otherwise placed them near the air base perimeter as shown by the evidence of record, then herbicide exposure is to be conceded.

The Veteran's DD Form 214 establishes that he served in the United States Air Force as an aircraft fuel systems mechanic. Personnel records substantiate that he was regularly dispatched to handle, fuel leaks and cell repair, on airplanes and helicopters. See Airman Performance Reports from September 1968 to March 1969. He reports that these duties regularly brought him into contact with perimeter fence areas, which included "trim pads, run-up areas, take off ready areas, fuel cell maintenance, tracks to the mess hall and barracks." See September 2013 Statement.

The Veteran was competent to report the geographical locations where he was stationed during military service. He has presented credible written testimony that, during his posting at the Udorn RTAFB, he was assigned to work in areas that were in close proximity to the airbase's perimeter. Additionally, of record are maps of the base, submitted by the appellant. See Representative Correspondence submitted in August 2015. These maps appear to confirm that the areas where the Veteran reported conducting his duty were indeed located near the perimeter of the base. See Representative Correspondence submitted in August 2015. 

The Board acknowledges that the Veteran did not serve in a position which VA has conceded as being exposed to herbicides on the base. However, the Board finds that the Veteran's consistent statements throughout the record, that he was required to work on equipment which was located near the perimeter of the airfield/base, are credible evidence of such exposure. As such, pursuant to M21-1MR, Part IV, Subpart ii, Chapter 2, Section C, para. 10(q), his exposure to dioxin-based chemical herbicides during active duty is conceded. 

VA medical records associated with the Veteran's claim establish that he had current diagnoses of Type II diabetes mellitus and prostate cancer. See May 2009 VAMC Tampa treatment medical records. As the regulations recognize these diseases as being presumptively associated with exposure to dioxin-based chemical herbicides (see 38 C.F.R. § 3.309(e)), his claim for service connection for Type II diabetes mellitus and prostate cancer are therefore granted. Any doubt that exists with regard to the merits of the Veteran's claim is resolved in his favor. 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. § 3.102 (2014); Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

PTSD Laws and Regulations

Disability evaluations are determined by the application of the VA's schedule for Rating Disabilities (Rating Schedule), 38 C.F.R. Part 4. The percentage ratings in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred in or aggravated during military service and their residual conditions in civil occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. 

When a question arises as to which of two ratings applies under a particular code, the higher rating is assigned if the disability more closely approximates the criteria for the higher rating. 38 C.F.R. § 4.7. 

At the time of an initial rating, separate ratings can be assigned for separate periods of time based on the facts found- a practice known as "staged" ratings. Fenderson v. West, 12 Vet. App. 119(1999). The Court has held that "staged" ratings are appropriate for an increased rating claim when the service-connected disability exhibits symptoms that would warrant different ratings. Hart v. Mansfield, 21 Vet. App. 505 (2007). 

Acquired psychiatric disorders are rated through the use of a general rating formula set forth in 38 C.F.R. § 4.130. Under this formula, the Veteran is currently rated at 30 percent for his PTSD, which is specifically categorized under DC 9411. A 30 percent rating is assigned for occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). In order to be entitled to the next-higher 50 percent rating, the evidence must show occupational and social impairment with reduced reliability and productivity due to symptoms such as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short-and long-term memory (e.g. retention of only highly learned material, forgetting to complete tasks); impaired judgment or impaired abstract thinking; disturbances of motivation and mood; or difficulty in establishing effective work and social relationships. See 38 C.F.R. § 4.130, DCs 9411 (2015). 

Although PTSD is rated under the General Rating Formula, the use of the term "such as" in 38 C.F.R. § 4.130 indicates that the listed symptoms are not intended to constitute an exhaustive list. Rather, the symptoms listed under the General Rating Formula for Mental Disorders are to serve as examples of the type and severity of symptoms or their effects that would justify a particular rating. See Mauerhan v. Principi, 16 Vet. App. 436, 442 (2002). The symptoms to be considered when rating a Veteran's PTSD are not limited to those listed in 38 C.F.R. § 4.130. Instead, VA shall consider all symptoms of a Veteran's PTSD that affect his level of occupational and social impairment, including, if applicable, those identified in the fourth edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV).

The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) provided additional guidance in rating psychiatric disability. See Vazquez-Claudio v. Shinseki, 713 F.3d 112 (Fed. Cir. 2013). Specifically, the Federal Circuit emphasized that the list of symptoms under a given rating is a nonexhaustive list, as indicated by the words "such as" that precede each list of symptoms. Id. at 2. It held that a veteran may only qualify for a given disability rating under § 4.130 by demonstrating the particular symptoms associated with that percentage or others of similar severity, frequency, and duration. Id. at 4. Other language in the decision indicates that the phrase "others of similar severity, frequency, and duration," can be thought of as symptoms of like kind to those listed in the regulation for a given disability rating. Id. at 2. 

Within the DSM-IV, Global Assessment of Functioning (GAF) scores are a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." See Carpenter v. Brown, 8 Vet. App. 240, 242 (1995); see also Richard v. Brown, 9 Vet. App. 266, 267 (1996). A GAF score is, of course, just one part of the medical evidence to be considered and is not dispositive. The same is true of any physician's statement as to the severity of a disability. It remains the Board's responsibility to evaluate the probative value of any doctor's opinion in light of all the evidence of record.

A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF score of 51-60 represents moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with coworkers).

PTSD Factual Background

By way of a rating decision dated in October 2010, service connection was established for PTSD. A 30 percent rating was assigned under Diagnostic Code 9411(Posttraumatic Stress). 

Turning to the treatment medical evidence of record, the Veteran's earliest PTSD screenings, in October 2008 and 2009, indicate he was negative for the disability. See Tampa VAMC treatment medical records. His first positive screening for PTSD was in February 2010. See Orlando VAMC treatment records. Similarly, depression screenings also indicate that although he reported feeling depressed he was not found positive for the condition until February 2010. Id.

Thereafter, he was diagnosed with PTSD and MDD by a VA psychologist. See April 5, 2010 Orlando VAMC treatment records. At the time of diagnoses, he reported symptoms of forgetfulness, fatigue, irritability, indecision, angry outbursts, concentration difficulties, hypervigilance, exaggerated startle and depression. His mood was anxious and depressed; with constricted affect. He was alert, cooperative and well-groomed, with good eye contact. He was characterized as a reliable historian, with intact orientation and "grossly intact" memory. His thought form was logical and organized, with non-bizarre content. Finally, he had average intelligence, with good insight, judgment and impulse control. 

Three days later, on his next examination, he reported symptoms of forgetfulness, fatigue, irritability, indecision, depression and occasional interrupted sleep. See April 8, 2010 Orlando VAMC treatment records. He was alert, fully oriented, attentive, neatly dressed, groomed, and polite with motor movements within normal limits. His mood was depressed and anxious, with congruent affect. Speech was noted as "fairly spontaneous coherent" and relevant, with normal volume and rate. His thought processing had no flight of ideas (FOI) or looseness of associations (LOA). Rather, he was organized and goal directed. His memory and impulse control were intact with no delusions, hallucinations or referential thinking. His insight was fair and his judgment was average. He also had no suicidal or homicidal ideations. At the conclusion of his examination, the physician gave him a GAF score of 44.

In September 2010, the Veteran was afforded a VA examination. On examination, he reported suffering from sleep impairment and panic attacks. Additionally, he reported having low energy that effected his completion of tasks and concentration. Notably, the examiner attributed this low energy to receiving iron treatments. He reported that his PTSD began in 2009. This was shortly after the death of his first wife of 42 years, who he was still grieving. He reported that his recent move from Virginia to Florida, away from all of his friends and family, plus her subsequent death, left him feeling isolated. However, he stated that he now had a fiancé, "it was going well," "she was supportive" and he "had plans to marry." He reported that they did things together like going to yard sales. During this period, he was working 20 hours a week, as a kiln operator, which was primarily an independent position. The Veteran had maintained this job for approximately 2 to 5 years. Prior to that position, he had worked for 14 years as a molding machine operator. When asked if he had lost anytime from work in the previous 12 months, he reported no, and that he worked "as he please[d]." When not working, he spent the remainder of his time at home with his fiancé, doing chores, or pursuing hobbies such as collecting coins and photographing airplanes. 

During examination, he was clean, casually dressed, cooperative and friendly; with fatigued psychomotor activity. Speech was clear and coherent with appropriate affect, but depressed mood. He had a short attention span, intact orientation and unremarkable thought processing. His thought content, showed preoccupation with other topics, including the loss of his wife, his other illnesses, finances and his VA claim. He had no delusions, episodes of violence, hallucinations and no inappropriate or obsessive/ritualistic behavior. In regards to judgment, he understood outcome behavior and had average intelligence. He was able to maintain minimal personal hygiene, as well as, the activities of daily living. Immediate memory was noted as normal; whereas remote and recent memories were mildly impaired. The examiner indicated the Veteran's current GAF score was 60.

The examiner opined that the Veteran did not have total occupational and social impairment. Moreover, his signs and symptoms of PTSD did not result in deficiencies in his judgment, thinking, family relations, work or mood. There was also no reduced reliability and productivity. Additionally, there was no occasional decrease in work efficiency, and or intermittent periods of inability to perform occupational tasks with general satisfactory functioning. The examiner found his PTSD signs and symptoms to be transient or mild. These symptoms decreased his work efficiency and ability to perform occupational tasks only during periods of significant stress. Finally, although the examiner noted occasional concentration and memory lapses, these symptoms were also characterized as mild and did not affect his performance, except to occasionally reduce speed of work. 

In making these assessments, the examiner referenced the Veteran's part-time job and his long and secure work history. The examiner also noted that he only reported minor problems with concentration and memory. Additionally, the examiner's assessments relied on evidence of the Veteran's general affect, his ability to focus, as well as, his feeling energized and at times hopeful. Finally despite the Veteran's depression regarding his wife's death, and his own illnesses, the examiner noted that he appeared to be maintaining positive relationships and interests. 

In February 2011, the Veteran reported increased forgetfulness, as well as, suffering from persistent nightmares that occurred several times a week. See Orlando VAMC treatment records. At the time he was stressed because of unemployment, he missed his job and his sister recently died. He reported speaking to his family and crying regularly, because he missed them. Lastly, he reported walking with his dogs for exercise.

On examination he was polite, alert, fully oriented, neatly dressed, had good hygiene and was groomed. His mood was depressed and frustrated with congruent affect. His speech was spontaneous, coherent and relevant, with normal volume and rate. Thought processing was organized, with no FOI or LOA. Memory and insight were fair to average. Thought content showed a theme of frustration and sadness. No delusions, hallucinations, or referential thinking were noted. Impulse control was intact and he had no suicidal or homicidal ideation. His GAF score was recorded as 46.

The remainder of the Veteran's examinations of record from May 2013 to September 2013 report consistent findings. See VAMC Orlando treatment records. Appearance was appropriate in dress and grooming. His mood ranged between anxious, euthymic and sad. Affect was congruent with his mood. Speech was coherent, relevant, logical and productive. His thought content was listed as normal with intact orientation, insight and judgment. Importantly, on examination he never displayed tangential or circumstantial thought, LOA, FOI, suicidal or homicidal ideation, hallucination, or delusion. Finally, he had the ability to make reasonable decisions in regards to medical care. His GAF score was 53.

PTSD Analysis

For the period of the appeal, the Veteran's PTSD has been rated at 30 percent. The medical evidence for this period shows that the Veteran's acquired psychiatric disorder had been manifested by no more than occasional decrease in work efficiency and symptoms including depressed mood, anxiety, chronic sleep impairment and mild memory loss. While not outcome determinative, some focus is placed on the finding that the symptom warranting a 50 percent rating - circumstantial, circumlocutory, or stereotyped speech; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships - were not shown. The Board also notes that beyond the Veteran's reports of suffering from panic attacks, angry outbursts and hypervigilance during his September 2010 VA examination, the treatment medical evidence of record is silent as to such reports. 

Further, although the appellant asserts that the Veteran reported some memory impairment on examination in September 2010, this was characterized by the examiner as mild. Additionally, post VA examination, treatment medical records reflect that his memory was regularly found to be intact. There is also no indication that memory problems interfered with the Veteran's ability to attend to the activities of daily living. Rather, prior to the deterioration of the Veteran's health due to his other illnesses, he reported spending time on hobbies, going to yard sales with his fiancé, and going on walks with his pets. See September 2012 VA examination. As to his socialization, the Board found it significant that the Veteran essentially reported having a positive and rich relationship with his then fiancé and now wife. Notably, the record clearly reflects that during the claims period he was able to socialize with, and marry the appellant. Additionally, notations in the record reflect that the Veteran was in regular contact with other members of his family. See February 2011 treatment record VAMC Orlando. Moreover, as discussed above, treatment records reflect that his feelings of isolation were related more to a loss of connection with family and friends, as a result of moving, rather than his PTSD. See September 2010 VA examination and February 2011 VAMC Orlando treatment records. 

With regard to occupational functionality, the record reflects that for the majority of the claims appeal period he was unemployed. It is acknowledged that the record is unclear as to why the Veteran became unemployed. Nevertheless, at the time of his September 2010 VA examination he was employed and working part-time 20 hours a week. At that time, he did not indicate an inability to maintain his employment due to his PTSD. Instead, he reported that he worked as "he please[d]." Importantly, the examiner concluded that the Veteran's PTSD, as well as its signs and symptoms, only occasionally affected his speed of working solely when he was stressed. 

Overall, the evidence of record tends to refute the finding that his acquired psychiatric disability caused difficulty in establishing and maintaining effective work and social relationships. The Veteran's symptoms are not of such severity, frequency or duration as to equate to the level of severity demonstrated in the criteria for a 50 percent rating. In essence, they do not equate to difficulty in establishing and maintaining effective work and social relationships. Furthermore, at no time during the period at issue did the evidence show that the Veteran has exhibited abnormal speech, difficulty in understanding complex commands, impaired judgment, or impaired abstract thinking. Additionally, no aberrant psychological features have been noted. Consequently, the assignment of a 50 percent rating (or higher) period during this appeal is not warranted under 38 C.F.R. § 4.130. 

Further, the Board is cognizant that the Veteran has consistently been assigned GAF scores ranging between 44 and 53, with one isolated 60. With regard to the lower level scores, the Board finds that they are inconsistent with the symptoms and clinical findings noted in the treatment reports where they are recorded, and no explanation for the discrepancy between the severity of the symptoms noted and the GAF score is provided. An assigned GAF, like an examiner's assessment of the severity of a condition, is not dispositive of the percentage rating issue; rather, it must be considered in light of the actual symptoms of a psychiatric disorder (which provide the primary basis for the rating assigned). See 38 C.F.R. § 4.126(a). Accordingly, an examiner's classification of the level of psychiatric impairment, by word or by a GAF, is to be considered but is not determinative of the percentage VA disability rating to be assigned; the percentage evaluation is to be based on all the evidence that bears on occupational and social impairment. Id.; see also 38 C.F.R. § 4.126, VAOPGCPREC 10-95, 60 Fed. Reg. 43186 (1995). In the present case, the Board finds the listed symptoms during treatment to be more probative than the seemingly incongruous GAF scores listed without explanation. 

In reaching the above conclusions, the Board has also not overlooked the Veteran's or the appellant's statements in support of the claim. In this regard, lay persons are competent to report on factual matters of which they have first-hand knowledge, e.g. psychiatric symptomatology including sleep impairment and concentration problems. See Washington v. Nicholson, 19 Vet. App. 362, 368 (2005). However, while the Board may consider the subjective lay statements regarding the severity of the disability, the Board notes that with respect to the Rating Schedule, the criteria set forth therein generally require medical expertise which lay persons are not shown to have. See King v. Shinseki, 700 F.3d 1339, 1344 (Fed. Cir. 2012). Furthermore, the Board finds the objective medical findings and opinions provided by the expert of record should be accorded the greater probative weight. See Guerrieri v. Brown, 4 Vet. App. 467, 473 (1993) ("the probative value of medical opinion evidence is based on the medical expert's personal examination of the patient, the physician's knowledge and skill in analyzing the data, and the medical conclusion the physician reaches. As is true with any piece of evidence, the credibility and weight to be attached to these opinions [are] within the province of the [Board as] adjudicators.").

The above determination is based upon consideration of applicable rating provisions. It should also be noted that there is no showing that the Veteran's disability presented so exceptional or unusual a disability picture as to warrant the assignment of any higher evaluation on an extra-schedular basis. See 38 C.F.R. § 3.321(b) (1). In this case, there has been no showing that the Veteran's disability picture for his acquired psychiatric disability could not be contemplated adequately by the applicable schedular rating criteria discussed above. The criteria provide for higher ratings, but as has been explained thoroughly herein, the currently assigned rating adequately describes the severity of the Veteran's symptoms for this disability during the period of appeal, namely disturbances of mood and sleep impairment. Given that the applicable schedular rating criteria are adequate, the Board need not consider whether the Veteran's acquired psychiatric disability picture includes such exceptional factors as periods of hospitalization and interference with employment. Referral for consideration of the assignment of a disability rating on an extraschedular basis is not warranted. See Thun v. Peake, 22 Vet. App. 111, 115-16 (2008).

ORDER

Service connection for Diabetes Mellitus Type II due to herbicide exposure is granted.

Service connection for prostate cancer due to herbicide exposure is granted.

An initial disability rating in excess of 30 percent for PTSD is denied.



REMAND

As previously discussed in the Board's recent remand, the appellant has filed a Notice of Disagreement (NOD) in April 2015 with an October 2014 Rating Decision denying service connection for the cause of the Veteran's death. No Statement of the Case (SOC) has been issued addressing this claim. Because a timely NOD was filed, the RO must now provide the appellant with a SOC on the issue of entitlement to service connection for the cause of the Veteran's death. See Manlincon v. West, 12 Vet. App. 238 (1999) (vacating a Board decision and remanding a matter where VA failed to issue a Statement of the Case after the appellant filed a timely Notice of Disagreement).

Accordingly, the case is REMANDED for the following action:

Furnish the appellant and her attorney with a Statement of the Case that pertains to the issue of entitlement to service connection for the Veteran's cause of death. Appellant should be appropriately notified of the time limits to perfect his appeal of these issues. The issue should not be sent to the Board unless the appellant perfects the appeal by filing a timely substantive appeal following issuance to her of a Statement of the Case.

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).





______________________________________________
GAYLE E. STROMMEN
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs